BILAL A. ESSAYLI
Acting United States Attorney
JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division
SAMUEL J. DIAZ (Cal. Bar No. 304503)
Assistant United States Attorney
Transnational Organized Crime Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3045
    Facsimile: (213) 894-6269
    E-mail:   samuel.diaz@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>YEVGENI GERSHMAN,<br><br>      Defendant. | No. CR 25-595-MCS-1<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT GERSHMAN'S MOTION FOR RELEASE FROM CUSTODY; DECLARATION OF SAMUEL J. DIAZ<br><br>Hearing Date: October 6, 2025<br>Hearing Time: 3:00 p.m.<br>Location:    Courtroom of the<br>                Hon. Mark C. Scarsi |

     Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Samuel J. Diaz, hereby files its opposition to defendant Yevgeni Gershman's motion for release from custody.

//

//

//

This opposition is based upon the attached memorandum of points and authorities, the declaration of Samuel J. Diaz, and the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 3, 2025          Respectfully submitted,

BILAL A. ESSAYLI
Acting United States Attorney

JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division


_____/s/_____
SAMUEL J. DIAZ
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION.................................................1

II.   FACTUAL AND PROCEDURAL HISTORY..............................1

      A.    Defendant's Background................................1

      B.    Defendant Operated Illegal Poker Games in Los Angeles.....2

      C.    Defendant Engaged in Marriage Fraud...................4

      D.    Indictment and Search of Defendant's Residence...........5

III.  STANDARD OF REVIEW..........................................7

IV.   DEFENDANT SHOULD REMAIN DETAINED PENDING TRIAL..............8

      A.    Defendant Is a Flight Risk............................8

            1.    Defendant's Alienage, Serial Deceit, and Criminal
                  History Show He is a Flight Risk..................8

            2.    The Nature and Circumstances of the Charged
                  Offenses Show Defendant is a Flight Risk...........11

            3.    The Weight of the Evidence Favors Detention........12

      B.    Defendant Poses a Danger to the Community and to
            Potential Government Witnesses........................13

      C.    No Release Conditions Will Reasonably Assure
            Defendant's Appearance at Trial or Ameliorate the
            Danger Defendant Poses................................15

V.    CONCLUSION..................................................17

**TABLE OF AUTHORITIES**

**CASES**

United States v. Gebro, 948 F.2d 1118, 1121 (9th Cir. 1991).........8

United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985)...8, 9

United States v. Santos-Flores, 794 F.3d 1088, 1089 (9th Cir. 2015)...........................................................9

United States v. Townsend, 897 F.2d 989, 996 (9th Cir. 1990)9, 12, 15

**STATUTES**

18 U.S.C. § 1546(a)................................................5

18 U.S.C. § 1955..................................................5

18 U.S.C. § 3142(g)...............................................8

18 U.S.C. § 371...................................................5

8 U.S.C. § 1325(c)................................................5

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Defendant Yevgeni Gershman is a danger to the community and a flight risk and there are no release conditions that will reasonably assure the safety of the community or his appearance at trial. Consistent with the findings of the magistrate judge and the original and supplemental recommendations of the Probation and Pretrial Services Office, defendant should remain detained pending trial.

### II.    FACTUAL AND PROCEDURAL HISTORY

#### A.    Defendant's Background

Defendant is 50-year-old Israeli man born in Belarus.  It is believed he arrived in the United States on a tourist visa in the Summer of 2021, when he was 46 years old.  He is an alien in the United States and has no permanent legal status.  There is an Immigration and Customs Enforcement hold on defendant.

In January 2022, Israeli authorities informed the Los Angeles Police Department that defendant was a senior member of the Michael Tansky criminal organization and that they believed that defendant was now residing in the Los Angeles area.  The Tanksy Organization is an Israeli organized crime group headed by Michael Tanksy that engages in drug trafficking, human trafficking, and illegal gambling, among other rackets.[1]  Israeli authorities further explained that defendant was Tansky's right-hand man, had a lengthy criminal history, and engaged in violence.

---

[1] See, e.g., Head of 'Russian mafia' in Israel arrested thanks to criminal-turned informant | The Times of Israel.

The government proffers that according to an English translation of criminal history records received from the State of Israel, defendant has the following criminal convictions:

- 11/24/2015:  Convictions for (1) assault and actual bodily harm by two or more individuals; and (2) assault causing actual bodily harm, for which defendant served a custodial sentence.  According to law enforcement sources, the victim of defendant's assault died as a result.

- 1/5/2012:  Conviction for attempt to obstruct an investigation.

- 12/22/2009: Conviction for malicious damages to motor vehicle.

- 10/25/2009: Conviction for possession of property suspected to be stolen.

- 1/3/2005: Convictions for (1) aggravated assault committed by two or more persons; and (2) conspiracy to commit a felony, for which defendant served a custodial sentence.

- 9/16/1998: Convictions for (1) possession/use of dangerous drugs not for personal use; (2) possession use of dangerous drugs not for personal use; (3) export, import, trafficking, and supply of dangerous drugs; (4) criminal trespass, for which defendant served a custodial sentence.

- 3/26/1997: Conviction for possession/use of dangerous drugs for personal consumption.

**B.    Defendant Operated Illegal Poker Games in Los Angeles**

On January 27, 2022, federal agents executed a search warrant at a residence in Sherman Oaks, California and broke up an illegal poker game in progress.  Defendant was present during the search and was

2

1    detained.   Agents took defendant's phone and searched it pursuant to

2    a federal search warrant.   In defendant's phone, agents found

3    numerous conversations regarding running illegal poker games,

4    including pay/owe sheets showing that defendant and his co-

5    conspirators charged players a rake, and videos of suspected illegal

6    gambling games.   Agents also found a Russian language text chain

7    between defendant and a phone contact.   Diaz Declaration ("Decl."),

8    Ex. A.   According to a translation of the messages, on November 19,

9    2021, defendant texted his contact: "Listen to me moron if you are

10    not going to answer my calls and wont give back my money I will come

11    to your house stupid bitch."   Id. at p. 8.

12        In March 2022, a source of information ("SOI") told LAPD

13    detectives that he/she had lost over $1 million at an illegal

14    gambling game run by defendant and others.   The SOI refused to pay

15    because he/she believed he/she had been cheated.   Since he/she

16    refused to pay the gambling debt, defendant engaged harassed and

17    threatened him/her over several months and directed others to harass

18    him/her as well.   The SOI told law enforcement that defendant had

19    told one of the SOI's friend's that if the SOI did not pay the

20    gambling debt, that the SOI's kids would be kidnapped and a grenade

21    would be thrown at his residence.

22        In July 2022, federal agents executed a search of a house on

23    Gable Drive in Encino, California (the "Gable House") and interrupted

24    an illegal poker game in full swing.   They arrested defendant and

25    several others and seized a second phone from him.   In addition,

26    agents found defendant in possession of a driver's license in his

27    name from Cyprus.   Diaz Decl. Ex. B.   Defendant spoke with law

28    enforcement following his detention and told them that he resided at

a residence on Hatteras Street in Woodland Hills, California (the "Hatteras residence").

Defendant's phone contained numerous communications regarding illegal poker games, including pay/owe sheets that listed defendant as a partner of the Gable House game and texts inviting players to play at his illegal poker game. In addition to evidence showing that defendant and his co-conspirators charged players a rake, defendant recruited young women to work the games and provide companionship to players and at times recruited women to engage in prostitution. In exchange, defendant "taxed" the women from the tips they received from poker players, in an amount ranging from 25 to 35 percent of their earnings. See Dkt. 1 at Overt Acts 22-24.

### C.    Defendant Engaged in Marriage Fraud

In February 2022, during the same period that he was operating illegal poker games, defendant married co-defendant V.C., a United States citizen, as part of a sham marriage to obtain permanent legal status in the United States. During this process defendant submitted immigration forms to the United States Citizenship and Immigrations Services ("USCIS"). On one form, submitted in April 2022, defendant was asked whether he had "**EVER** been arrested, cited, charged, or detained for any reason by any law enforcement official (including but not limited to any U.S. immigration official of the U.S. armed forces or U.S. Coast Guard)?" Defendant answered "No." Defendant also answered "No" when asked whether he intended to engage in illegal gambling or commercialized vice, including prostitution. Defendant further stated the he resided at residence on Glade Avenue in Woodland Hills, California (the "Glade Avenue residence"). During surveillance of the Glade Avenue residence over a several month

4

period, law enforcement never saw defendant at the Glade Avenue residence.  In contrast, a pole camera placed in front of the Hatteras residence revealed that defendant lived there with his actual girlfriend, E.K., and their minor son.

In September 2022, defendant had an in-person interview with USCIS regarding his adjustment of status application.  During this interview, conducted under penalty of perjury, defendant told USCIS that he had never even been detained by police and had never engaged in unlawful activity and again claimed that he resided at the Glade Avenue residence.

As part of the adjustment of status process, defendant obtained a work authorization card, but has not obtained permanent legal status.  He is unlawfully present in the United States as his tourist visa has long expired.

### D.    Indictment and Search of Defendant's Residence

On July 15, 2025, a grand jury returned an indictment charging defendant with five counts, including: (1) conspiracy to operate an illegal gambling business in violation of 18 U.S.C. § 371; (2) operating an illegal gambling business in violation of 18 U.S.C. § 1955; (3) conspiracy to commit marriage fraud in violation of 18 U.S.C. § 371; (4) marriage fraud in violation of 8 U.S.C. § 1325(c); and (5) false statements in visas, permits, and other immigration documents in violation of 18 U.S.C. § 1546(a).  Dkt. 1.  Each count carries a statutory maximum term of imprisonment of five years.

On July 30, 2025, law enforcement executed a search warrant at defendant's residence where defendant resided with E.K. and their minor son.  In a gun case inside the garage, agents found: (1) an unbranded AR-style rifle and AR magazine; (2) an unbranded .22

caliber pistol and unbranded .22 caliber magazine; (3) a serialized Ruger pistol and magazine and nine rounds of 9mm ammunition. Agents also found a set of poker chips in defendant's garage. Inside a backpack found in the closet of one of the bedrooms, agents found: (1) a Taurus-brand pistol with one round of ammunition in the chamber; (2) four Taurus-brand magazines; (3) eight rounds of 9mm ammunition; (4) a Taurus .38 caliber revolver loaded with six rounds of .38 caliber ammunition; and (5) 15 additional rounds of ammunition.





In addition to the firearms and ammunition, agents found a letter in Hebrew signed by defendant.  According to law enforcement's rough translation, defendant wrote a letter in favor of Michael Tansky which appeared to be prepared for filing in support of Tansky in a legal proceeding.

After searching his residence, agents arrested defendant and read him his <u>Miranda</u> rights.  Defendant agreed to waive his rights and speak with the agents in a Hebrew-language interview.  Defendant was asked about the guns they had found.  After initially denying knowing about the guns, defendant told the agents that he had acquired the guns in the garage during a storage purchase three and a half years ago.  He later told agents that he believed everyone had guns in America.  He also added that he kept guns in the home because of frequent crime in the area.

That same day, defendant made his initial appearance before the Honorable Jacqueline Chooljian where the detention hearing was continued.  On August 7, 2025, Judge Chooljian held a detention hearing and found by a preponderance of the evidence that no condition or combination of conditions would reasonably assure defendant's appearance and by clear and convincing evidence that no condition or combination of conditions would reasonably assure the safety of any other person and the community.  Dkt. 114.  On September 22, 2025, defendant filed the instant motion ("Mot.") for release from custody.  Dkt. 147.

**III. STANDARD OF REVIEW**

The Bail Reform Act of 1984 authorizes pretrial detention of a defendant "where it is demonstrated either that there is a risk of flight or no assurance that release is consistent with the safety of

7

1  another person or the community." United States v. Motamedi, 767

2  F.2d 1403, 1406 (9th Cir. 1985).  "[T]he government bears the burden

3  of showing by a preponderance of the evidence that the defendant

4  poses a flight risk, and by clear and convincing evidence that the

5  defendant poses a danger to the community." United States v. Gebro,

6  948 F.2d 1118, 1121 (9th Cir. 1991).

7      In determining whether release on bond is warranted, courts

8  consider (1) the nature and circumstances of the offense charged;

9  (2) the weight of the evidence against the defendant; (3) the history

10 and characteristics of the defendant; (4) and the nature and

11 seriousness of the danger defendant poses to any person or the

12 community.  18 U.S.C. § 3142(g).

13 **IV.  DEFENDANT SHOULD REMAIN DETAINED PENDING TRIAL**

14      **A.  Defendant Is a Flight Risk**

15      Defendant's personal characteristics, the nature and

16 circumstances of the offenses, and the weight of the evidence all

17 make plain that defendant is a flight risk.

18          1.  <u>Defendant's Alienage, Serial Deceit, and Criminal

19              History Show He is a Flight Risk</u>

20      First, defendant is an alien from Israel who has never had

21 permanent legal status in the United States.  He came to the United

22 States on a tourist visa and overstayed the visa.  He then entered

23 into a sham marriage with a United States citizen to fraudulently

24 obtain permanent residency.  Contrary to defense counsel's assertion,

25 although he was granted a work authorization card pursuant to the

26 adjustment of status process, he has never been granted permanent

27 legal status and he faces an active ICE hold.

28

Defendant has shallow ties to the United States.  He has spent 46 of his 50 years outside of the United States, which includes his entire childhood and most of his adult life.  He has extensive family in Israel, including at least one child as well as his parents, and business and personal contacts outside of the country.  He claims that two of his children reside in the United States but does not contend that either of them has legal status to live here.  Cf. United States v. Motamedi, 767 F.2d 1403, 1407-08 (9th Cir. 1985) (noting the defendant's strong ties to the community, including the defendant's permanent resident status, and over 85 family members in the United States); United States v. Santos-Flores, 794 F.3d 1088, 1089 (9th Cir. 2015) (nothing the defendant's close ties because he had lived in the United States since childhood and worked for same employer for 9 years).  Defendant's less than three years of employment with an electric company and his friends are shallow links to the United States.

Defendant's ties abroad extend beyond Israel, as evidenced by his driver's license from Cyprus.  Defendant's access to large amounts of capital, evidence by a bond offer totaling $695,000, underscores defendant's ability to flight.  See United States v. Townsend, 897 F.2d 989, 996 (9th Cir. 1990) ("Also among their characteristics must be considered their access to substantial sums of cash . . . Within a few days of his arrest, [the defendant], a business man from New Delhi making $60,000 a year, was supplied with $1 million bail by his friend from Switzerland.  This money was not a reliable assurance of his presence for trial.").

Second, defendant is a serial liar.  In his brief, defense counsel claims that defendant "readily acknowledges his criminal

9

history and regrets the life he lived[.]"  Mot. at 8.  Defendant's acknowledgement of his long criminal record stands in stark contrast to his multiple misrepresentations to USCIS that he has never been arrested, much less convicted of a crime.  Defendant told USCIS that he had never even been detained by police anywhere during an interview in September 2022 despite having been detained in January 2022 at the Chandler House residence and in July 2022 at the Gable House in this investigation alone.  It is also false given defendant's long criminal history.

Defendant also lied about his residence, telling USCIS that he resided at the Glade Avenue residence in April and September 2022 while telling law enforcement that he resided at the Hatteras Street residence at his detention at the Gable House in July 2022. Defendant continues to lie about his residence, as he maintains that he resides at the Glade Avenue residence when he was arrested at a new residence with E.K. and their minor son on July 30, 2025 and was never seen at the Glade Avenue residence during pre-arrest surveillance.

Defendant's contention that he has lived a law-abiding life in the United States is also a lie.  Mot. at 2.  Far from choosing a new life, defendant has engaged in serial criminality during his time in the United States, including operating an illegal gambling business, lying to immigration authorities, and possessing firearms and ammunition.

Third, defendant's lengthy criminal history, including an Israeli conviction for obstruction of an investigation, undercuts the notion that defendant will comply with conditions of pretrial release.  Defendant's close criminal connections to the Michael

10

Tanksy criminal organization elevate his potential to flee. Defendant's characterization of his ties to the Tanksy organization as "nothing more than speculation and innuendo" is wrong.  Israeli authorities identified defendant as a high-level member of the Tanksy organization and their finding is supported by the letter in favor of Michael Tansky found in defendant's residence on July 30, 2025.

As to defendant's contention that he is not a flight risk because he did not flee after he was detained at the Gable House in July 2022, it is at least as plausible that defendant did not flee because he surmised that, given that he was not immediately arrested and charged, there was no active federal investigation against him.

### 2.    The Nature and Circumstances of the Charged Offenses Show Defendant is a Flight Risk

The nature and circumstances of the offenses charged demonstrate defendant's criminal know how and sophistication.  Despite being an alien in the United States and not a native English speaker, defendant organized high-stakes, luxury illegal poker games throughout the Los Angeles area that generated thousands of dollars each game night.  He recruited players to play at the games, collected gambling debts from the losers, and hired and taxed women to staff the games.  Simultaneously, he had the know how to find a U.S. citizen and convince her to enter into a sham marriage with him in order to obtain permanent legal status.  Defendant's criminal pedigree weighs in favor of finding him a flight risk.  See Townsend, 897 F.2d at 995 ("Although neither violence nor the distribution of drugs are charged, the accusations are of sophisticated criminal conduct, whose successful completion required the ability to travel internationally, adapt easily to foreign countries, and to move

assets and individual quickly form one country to another.").  Nor is it correct that illegal gambling has no relation to violence. Illegal gambling generates gambling losses for its players and those losses are often collected by threats or force.

"Consideration of the nature of the offenses charged involves consideration of the penalties."  <u>Townsend</u>, 897 F.2d at 995. Defendant faces steep exposure if convicted.  For defendants charged with multiple counts, "it is reasonable, from their perspective to look at the potential maximum sentences they face if they were found guilty on each count and sentenced consecutively on each count."  <u>Id.</u> Here, defendant is charged with five counts, each of which carries a five-year statutory maximum sentence.  He thus faces a maximum exposure of 25 years' imprisonment, affording him ample incentive to flee.  Defendant attempts to minimize the charged offenses by presenting low guidelines calculations that do not account for defendant's aggravated role in the offenses, enhancements for grouping, or for lack of acceptance of responsibility.  Defendant's incentive to flee is greater still in light of the fact that he is on notice that he may subject to additional charges, including, but not limited to, being an alien in possession of firearms and ammunition. And unlike before, he is now well aware of the existence of an active federal prosecution against him.

       3.   <u>The Weight of the Evidence Favors Detention</u>

While the weight of the evidence is the least important factor, it nevertheless weighs in favor of detention.  The evidence consists of, among other things, text messages from defendant regarding his illegal gambling business, documents, including pay/owe sheets showing that defendant and his co-conspirators charged players a

rake, and recordings in which defendant made false statements about

his criminal history, residence, and relationship status.[2]

For all of these reasons, defendant presents a clear risk of

flight.

### B. Defendant Poses a Danger to the Community and to Potential Government Witnesses

The record before the Court amply supports finding that

defendant is a danger to the community.  As a threshold matter,

defendant's contention that the charges do not contain allegations of

violence is irrelevant to the dangerousness inquiry.  In conducting

this inquiry, the Court is not limited to the four corners of the

indictment, but rather can consider defendant's history and

characteristics.[3]

Defendant has a long and violent criminal history.  In 2015,

he was convicted of two violent offenses, including assault and

actual bodily harm by two or more individuals and assault causing

bodily harm, which resulted in the victim's death.  He has additional

violent convictions, including 2005 convictions for aggravated

assault by two or more individuals and for conspiracy to commit a

---

[2] Defense counsel states both that the government has produced "an excess of 16,700 pages of Discovery not including the Cellebrite information," and that the government has produced "minimal" discovery.  Mot. at 5 and 8.  The government has complied with its discovery obligations and will continue to do so.

[3] Defendant misunderstands the purpose of an indictment, which is simply "a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]"  Fed. R. Crim. P. 7.  An indictment does not contain an exhaustive account of the entire investigation, much less an accounting of each defendant's personal characteristics.

1   felony.  In addition, he has convictions for obstruction of

2   investigations and prior drug trafficking convictions.

3        The instant investigation has shown the danger that defendant

4   poses to the community, including threatening a phone contact who

5   owed him money in November 2021, "Listen to me moron if you are not

6   going to answer my calls and wont give back my money I will come to

7   your house stupid bitch."  Diaz Decl. Ex. A at p. 8.  The SOI

8   reported that defendant harassed him/her to collect a gambling debt

9   and learning that defendant had told a friend that if the SOI did not

10  pay his/her gambling debt to defendant, that the SOI's children would

11  be kidnapped and his/her home would be attacked with a grenade.

12       In addition, defendant was recently found in possession of five

13  firearms in his residence, including an AR-style rifle and several

14  handguns along with numerous rounds of ammunition.  Defendant's

15  possession of five firearms and ammunition presented a clear danger

16  to the community, a salient danger in light of defendant's membership

17  in a violent organized group, and his lengthy and violent criminal

18  history.

19       Defendant claims that the government has not shown that the

20  firearms "(1) were possessed by Mr. Gershman; (2) were unlawful to

21  possess; (3) were used by Mr. Gershman; or (4) are in any way related

22  to the offense conduct."  Mot. at 11.  Defendant is wrong on all

23  prongs.  The firearms were found in defendant's residence where he

24  resided with E.K. and his minor son.  In a Mirandized interview he

25  claimed to have obtained the firearms in a storage sale and to have

26  had them for protection.  It is unlawful for an alien unlawfully

27  present in the United States or on a nonimmigrant visa, including a

28  tourist visa, to possess firearms and ammunition.  18 U.S.C.

§ 922(g)(5).  That the government has not shown that defendant used the firearms does not mean that defendant's possession of five firearms does not pose a danger to others or the community. Similarly, that the firearms are unrelated to the current charges is of no event to whether defendant's possession of firearms poses a danger to the community.

And while not dispositive to the inquiry, defendant's membership in the Tanksy Organization cements that defendant poses a danger to potential government witnesses and the community if released pending trial.

### C.    No Release Conditions Will Reasonably Assure Defendant's Appearance at Trial or Ameliorate the Danger Defendant Poses

Defendant counters that he should be released on bond because five individuals are willing to act as sureties for a total of $695,000 including:

- $500,000 secured in equity in an unidentified property owned by defendant's employer, Jonathan Sabag;
- $100,000 unsecured from E.K.'s sister, Orit Elya;
- $50,0000 unsecured from defendant's friend of three years, Shmuel Federbush;
- $25,000 unsecured from defendant's friend of three to four years, Eliran Jakobson; and
- $20,000 unsecured from defendant's friend of three years, Ion Topa.

The Ninth Circuit has ruled that large bond resources alone are insufficient to reasonably assure a defendant's appearance at trial. In Townsend, the defendant was charged with selling high value computers to the Soviet Union.  897 F.2d at 989.  Within a day of the

defendant's arrest, a Swiss friend offered to put up $1 million in cash for the defendant's release.  Id. at 996.  Townsend explained that because the bond came not from a family member, but from a friend, that it did not serve to reasonably assure the defendant's presence at trial.  "The purpose of bail is not served unless losing the sum would be a deeply-felt hurt to the defendant and his family; the hurt must be so severe that defendant will return for trial rather than flee."  Id.  Along the same vein, the Court explained that the defendant, who claimed to earn $60,000 annually, "could not have made up the loss of $1 million to Lang even if he wished to do so."  Id.

Townsend is on point.  Defendant's employer for the past two and a half years is seeking to pledge $500,000 secured in equity in one of his properties.  The money is not coming from defendant's purported spouse, his parents, or a close family member or friend.  Cf. Motamedi, 767 F.2d at 1407-08 (where the defendant's parents posted their residence as security for a $750,000 bond).  Defendant would not feel a deep hurt from the loss of his employer's money and therefore this sum would not reasonably assure defendant's appearance.  In addition, defendant purports to earn $2,500 bi-weekly, with results in annual earnings of approximately $65,000.  Defendant is therefore not in a position to make up his employer's loss of $500,000 "even if he wished to do so."

That defendant's employer of a relatively modest period is willing to post half a million dollars secured in one of his properties for defendant's release is also suspect.  See Townsend, 897 F.2d at 996 ("No doubt it is within the realm of possibility that one friend would have such confidence in another friend that he would

16

borrow a million dollars and bet it on the friend not trying to avoid a serious criminal trial.  But it is not very probable.  To advance this kind of money . . . is strange conduct.").

As to the other offers of bond, they are all unsecured, from non-family members, and not long-time friends, and would be insufficient to reasonably assure defendant's presence.  In addition, defendant has failed to provide information as the proposed sureties' finances and their ability to actually perform on the commitments as sureties.

The proposed bond is also insufficient because it does not ameliorate in the least the danger that defendant poses to the community or to potential government witnesses if released.

Because there are no conditions that reasonably assure defendant's appearance or the safety of the community, defendant should be detained pending trial.

**V.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion for release from custody.

## DECLARATION OF SAMUEL J. DIAZ

I, Samuel J. Diaz, declare as follows:

1.    I am an Assistant United States Attorney in the Central District of California and I represent the United States in <u>United States v. Gershman, et al.</u>, 25-595-MCS.  I have knowledge of the facts set forth herein and could and would testify to those facts fully and truthfully if called and sworn as a witness.

2.    Attached as Exhibit A is a true and correct copy of a Russian language WhatsApp conversation between defendant Gershman and a phone contact, along with a translation of the Russian language prepared by Homeland Security Investigations.  Defendant's messages are in green.

3.    Attached as Exhibit B is a true and correct copy of a Cyprus identification in defendant's name.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on October 4, 2025.

/s/
SAMUEL J. DIAZ